**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **STIFEL, NICOLAUS & COMPANY, INC.,** | ) | |
| | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Case No.: 4:23-cv-00241 |
| | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **SAPIENT CAPITAL, LLC, and** | ) | |
| **SAPIENT CAPITAL FOUNDERS, LLC,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Respondents. | ) | |

## COMPLAINT

Plaintiff Stifel, Nicolaus & Co., Inc. ("Stifel"), for its Complaint against Sapient Capital, LLC ("Sapient") and Sapient Capital Founders, LLC (together with Sapient, "Defendants"), alleges:

1.     Stifel seeks damages resulting from Defendants' orchestrated raid of Stifel's Indianapolis, Indiana office (the "Indianapolis NW office" or "KCP Group"). Defendants' wrongful conduct includes Sapient's raid of Stifel's employees and business and false advertising designed to mislead clients into believing that Stifel's Indianapolis NW office is now Sapient and that Sapient controlled Stifel's client base and their assets.

2.     Stifel invested for nearly two decades in building its premier, client-serving Indianapolis NW office. By February 16, 2023, that office was flourishing, with more than 30 employees, approximately 7,500 client accounts, and approximately $10 billion under management for a satisfied client base. Stifel's contributions to the success of the Indianapolis NW

1

office included large-scale investment in the people who worked there, the creation of unique investment opportunities for its clients, and providing second-to-none client service for these accounts. In recent months, Stifel also entered a new, 10-year lease for the office, creating an environment for its employees and clients that allowed both to thrive.

3.       Then, on February 17, 2023, and without prior notice to Stifel, the Indianapolis NW office's three Managing Directors and Chief Operating Officer executed a coup, inducing more than 30 Stifel employees to abandon their positions and emptying the Stifel office, all in an effort to render Stifel unable to service its clients and presenting Sapient as the new owner of Stifel's business.

4.       On the evening of February 16, 2023, Managing Directors James (Jamie) M. Knall ("Knall"), Thomas J. Pence, and Jeffrey S. Cohen—while still employees of Stifel—extended employment offers to Stifel Indianapolis NW office brokers and executives for positions at a newly registered investment advisor—Defendant Sapient Capital, LLC—majority-owned and managed by Knall, Pence, and Cohen. Contrary to industry practice, their fiduciary duties as Stifel employees, and established ethical principles, no notice of this was provided to Stifel.

5.       The next morning, Cohen, Pence, and Knall sent their resignation letters to a Stifel employee via email. Eleven minutes later, the Indianapolis NW office's Chief Operating Officer Andrew LeBlanc (who was himself subject to his own enforceable non-solicitation agreement with Stifel), forwarded resignation letters for himself and 27 other employees in the office, and indicated others would follow under separate email.

6.       Immediately after receiving LeBlanc's email, the Stifel employee who received the e-mail (and who worked at a near-by Stifel office) drove to the Indianapolis NW office. He found the office empty, with a stack of the resignation letters left behind. Stifel has since received client

complaints that this raid left them without critical support for investment activities, although Stifel has taken large-scale efforts to remedy this situation.

7.      With Stifel's personnel raided, Defendants immediately turned from raiding Stifel employees to efforts to improperly move Stifel client accounts to Sapient. To do so, Defendants made material misrepresentations about Sapient's assets under management and falsely claimed that Stifel's office was "now" Sapient. Sapient's website launched with information intended to mislead the public and current clients, such as stating that Sapient (in operation less than a day and with *zero* client accounts transferred to it) already had $10 billion in assets under management, had 50 plus years of experience and 40 clients with more than $50 million in assets. But ***none*** of those statements were true as to Sapient. To the contrary, these claims were lifted almost verbatim from Stifel's Indianapolis NW office website, refer to Stifel's client base, and were made at a time when the LinkedIn pages of Sapient's new management (Knall, Cohen, and Pence) identified them all as ***still*** working at the Indianapolis NW office for Stifel. At the time Sapient first published those statements—and as recently as February 21, 2023—it had ***no*** assets under management, ***no*** clients, and ***no*** experience operating as a registered investment adviser. Then, on February 22, 2023, Sapient boldly represented on its social media accounts that Stifel's KCP Group "is now Sapient Capital."

8.      Sapient's plot was at least months in the making, taking place while its owners were still employed by Stifel. In October 2022, while they were Managing Directors at Stifel, Cohen, Pence, and Knall organized Sapient to become a competitor to their current employer. Sapient, acting through Knall, Pence, and Cohen, set up shop 0.3 miles from Stifel's Indianapolis NW office. Knall, Pence, and Cohen continued to work as Stifel employees for several months without providing any notice to Stifel, in complete disregard of their obligation to report outside business

activities as required by FINRA. This tortious conduct materially harmed Stifel's Indianapolis NW office and its clients.

9.      Defendants have misappropriated the equity and goodwill that Stifel built in the Indianapolis NW office over nearly two decades and tens of millions of dollars in investment. Through their raid, Defendants have effectively transferred the value of Stifel's equity and goodwill to Sapient without any compensation to Stifel. The details of Defendants' raid and the severe economic harm inflicted on Stifel are set forth below.

10.     Stifel seeks damages for (1) false advertising under the Lanham Act; (2) common law injurious falsehood; (3) tortious interference with the LeBlanc employment contract; (4) tortious interference with business relationships; (5) unjust enrichment; (6) breach of fiduciary duty aided and abetted by Defendants; (7) fraudulent misrepresentation/concealment; and (8) common law unfair competition.

## PARTIES

11.     Plaintiff Stifel is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at 501 North Broadway, St. Louis, Missouri 63102.

12.     Defendant Sapient Capital LLC is an organization with its principal place of business in Indiana. It was formed under Delaware law.

13.     Defendant Sapient Capital Founders, LLC, which owns Sapient in part or in full, is an organization formed under Delaware law.

14.     Although not parties to this action, the former Stifel employees that orchestrated the scheme at issue are parties to a pending FINRA arbitration. They are Knall, Pence, Cohen, LeBlanc, Eduardo Michael Aguirre, and Michael James Hall. The Sapient entities are not subject to any arbitration agreement with Stifel. No member of Sapient Capital LLC or Sapient Capital

Founders, LLC, is a citizen of the State of Missouri.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, and all other claims fall under the Court's ancillary jurisdiction, 28 U.S.C. §§ 1338(b) and 1367.

16.     Subject matter jurisdiction is also proper under 28 U.S.C. § 1332 because there is complete diversity between the parties, in that Stifel and the Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendants consistent with the Due Process Clause of the U.S. Constitution and Missouri's long-arm statute, Mo. Rev. Stat. § 506.500, because Defendants transacted business in Missouri, made contracts within Missouri, and committed tortious acts within Missouri. *Id.* § 506.500.1(1)-(3). The claims arise out of (i) a non-solicitation agreement with Stifel in Missouri; (ii) a client list that Sapient took from Stifel that includes clients with Missouri addresses and clients invested in limited liability companies created under Missouri law and/or operated by Stifel (as managing member and general partner) in Missouri; (iii) misrepresentations regarding a lease signed by Stifel in Missouri where Stifel, from Missouri, built out the office space at issue; and (iv) many loans and other business activities demonstrating that Defendants transacted business in Missouri.

18.     These claims also arise out of statements by Defendants on their website and social media, including Twitter, Facebook, Instagram, and LinkedIn, disseminated in Missouri and which harm Stifel at its Missouri headquarters.

19.     These claims also arise out of Defendants' use of a Stifel client list for purposes of inducing these clients to leave Stifel. This list includes clients based in Missouri or who hold

interests in investment vehicles created under Missouri law or where the general partner or managing member is based in Missouri.

20.     Venue is proper in the Eastern District of Missouri because a substantial number of the events giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b)(2). Stifel is based in this District.

## FACTUAL BACKGROUND

**A.  The Origins of Stifel's Indianapolis NW Office and the KCP Group.**

21.     Stifel's Indianapolis NW office (also referred to as the KCP Group) opened in 2005.

22.     Prior to 2005, Cohen and Knall's father, David Knall, were employed by a financial management company, McDonald Investments, Inc. ("McDonald"), which had been recently acquired by Key Corp.

23.     In spring of 2005, Cohen and David Knall hoped to leave their employment with McDonald and decided to form Stifel's Indianapolis NW office. Both Cohen and David Knall accepted positions as Stifel employees, serving as Managing Directors of the Indianapolis NW office. Stifel accomplished this transition consistent with industry norms, an open dialogue with McDonald, and without disruption to clients. Stifel provided notice of the contemplated transition to McDonald and negotiated with McDonald to ensure that McDonald's rights were protected and that clients would face no disruption. Stifel's treatment of McDonald demonstrated to Cohen and Knall how to ethically and lawfully transition to a new investment company that would not result in disruption to clients or employees.

24.     Stifel paid Cohen and David Knall upfront bonuses and promised a back-end bonus if certain targets were met, for a total of approximately $15 million. Each was also given unqualified stock options on Stifel Financial Corp. stock. (Stifel Financial Corp. is the parent of

plaintiff Stifel Nicolaus.)

25.     In exchange for the bonuses, Cohen and David Knall entered into demand promissory notes, which were to be satisfied if certain production targets were met over an 8-year period.

26.     The promissory notes entered into by Cohen and David Knall provided that principal payments were to be made at Stifel's office in St. Louis, Missouri, or any other place at Stifel's election. The promissory notes provided that they were governed in accordance with the laws of the State of Missouri.

27.     The parties discussed and understood that David Knall and Cohen could terminate their relationship with Stifel, including potentially soliciting clients and competing with Stifel, if there was a change in Stifel ownership or executive management.

28.     Such change in Stifel ownership or executive management has not occurred.

29.     Unlike their sudden departure from Stifel this month, Cohen and David Knall worked with McDonald to achieve mutually acceptable terms of their departure, including payment terms and details to ensure an orderly transfer of client accounts.

30.     As part of the agreements with McDonald and Stifel, Cohen and David Knall were permitted to bring their team over to Stifel, including Knall. Knall would also become a Managing Director at Stifel.

31.     The transition to Stifel was accomplished over an agreed period of approximately one month to ensure that some employees remained at McDonald while any client accounts were transferred to avoid client confusion.

32.     Approximately $4 billion in assets were anticipated to transfer in the transaction, again with McDonald's consent. Stifel sought consent from the New York Stock Exchange to

approve the process by which Stifel would transfer accounts assigned to McDonald's brokers so that they could be transferred before the transition period concluded.

33.     In exchange, McDonald was paid a flat sum and a per-account fee for all accounts to be transferred to Stifel. McDonald was also paid a fee for furniture and other property, and the parties agreed that the lease on the office space would be assigned to Stifel.

34.     When David Knall departed McDonald for Stifel, he was serving a period of suspension at McDonald in connection with an investigation by the United States Securities and Exchange Commission into certain alleged conduct involving investment activity in advance of a tender offer. Stifel nonetheless supported David Knall and his colleagues during this time.

**B.  Knall Consents to Entry of a Final Judgment on SEC Charges**

35.     On December 5, 2007, the SEC announced that it had sued David Knall and filed a complaint in the U.S. District Court for the Southern District of Indiana alleging, generally, that before Knall joined Stifel he had received material, non-public information relating to a tender offer in June 2004—the year before he joined Stifel.

36.     David Knall received a twelve-month suspension preventing him from association with any broker, dealer, or investment adviser for a period of twelve months in connection with an insider-trading investigation. During this suspension, Stifel supported David Knall, his son Jamie and the entire Indianapolis NW office, including its clients. Stifel helped grow the Indianapolis NW office during the time when its prior leader could not serve clients and permitted the office to thrive until David Knall was permitted to return to active management.

**C.  Stifel's Indianapolis NW Office Operates From 2005 Through February 16, 2023.**

37.     Cohen and Knall continued to be employed by Stifel and work in the Indianapolis NW office from 2005 until February 16, 2023.

8

38.     Pence joined Stifel's Indianapolis NW office as a Managing Director in October 2016. Unlike a typical broker, Pence was paid a guaranteed salary by Stifel.

39.     Through their partnership, Stifel provided significant support to the Indianapolis NW office from 2005 through February 2023.

40.     From 2005 to 2023, Stifel provided a full suite of back-office support and operations to Cohen, Pence, Knall, and the Indianapolis NW office from Stifel's headquarters in St. Louis, Missouri.

41.     The back-office support and operations provided by Stifel to Cohen, Pence, Knall and the Indianapolis NW office enabled the office to service clients, make trades on client accounts, access stored client information, receive necessary administrative and operational support, satisfy their compliance obligations, and/or offer banking services to their clients.

42.     Without the support provided by Stifel from St. Louis, the Indianapolis NW office would not have been able to service clients, make trades on client accounts, access stored client information, receive necessary administrative and operational support, satisfy their compliance obligations, and/or offer banking services to their clients.

43.     The office's connections to Stifel's office in St. Louis are extensive.

44.     The Missouri-chartered and operated Stifel Bank (a corporate affiliate of plaintiff) made and currently holds loans for the now-former Stifel employees who left to join Defendant Sapient, as well as Stifel clients served by the Indianapolis NW office. Stifel's St. Louis headquarters places client cash accounts at Stifel Bank on a continual basis, with the full knowledge of Defendants and their clients. The funds held at Stifel Bank can be used to make investments and loans or to otherwise maintain a cash investment position. The raid of clients by Defendants includes clients who held money at Stifel's bank in St. Louis.

45.     Stifel also makes available to its clients serviced by the Indianapolis NW office a variety of funds to permit clients to take advantage of unique investment opportunities, including in real estate that are not available simply by buying and selling publicly-traded stocks. These funds are established as limited liability companies over which Stifel, from its St. Louis headquarters, is the manager and/or member. Stifel charges certain accounting-related fees for the services performed by its St. Louis-based accounting department for these investment vehicles. At the time of the raid (and today), clients who have been solicited by Defendants held accounts in these Missouri-operated entities.

46.     In addition to serving as the manager and/or member of these funds, Stifel provides further support to the funds from Missouri. For instance, Stifel provides compliance services such as the review of fund materials for Marketing Advertising and Graphics, notification of key regulatory initiatives, retention and assistance with policies and procedures, Volcker Rule compliance support, and accounting services from St. Louis. Additionally, the KCP fund investors receive numerous Stifel disclosures from St. Louis, such as the Stifel Financial Corporation privacy statement, the Stifel Investment Advisory Brochure, and the Stifel disclosures of regulatory events, where required by law.

47.     As of February 2023, Cohen, Knall, and Pence were the three Managing Directors at Stifel's KCP Group and the Indianapolis NW office.

48.     As of February 2023, the Indianapolis NW office served approximately 7,500 client accounts, representing approximately $10 billion in assets under management.

49.     As of February 2023, the Indianapolis NW office serviced clients located in Missouri, including in St. Louis, Missouri and Kansas City, Missouri.

50.     Stifel paid the employees of its Indianapolis NW office. Specifically, Cohen, Pence,

Knall, and LeBlanc were paid a commission based on their sales or salaries from Stifel.

51.     Stifel also paid the salaries of the office's support personnel and provided additional support funds.

52.     Many of the Indianapolis NW office employees, including Cohen, Pence, and Knall participated in Stifel's various benefits plans.

53.     Stifel provided the Indianapolis NW office an expense allowance to cover advertising, travel, and entertainment.

54.     Stifel leased and paid for office space for the Indianapolis NW office.

55.     Stifel owns the personal property within the office, including all technology, furniture, and other property.

56.     Stifel provided additional administrative and other back-office support to the office.

57.      Prior to February 16, 2023, Stifel had no knowledge of any intended changes to the Indianapolis NW office, including Cohen's, Pence's, or Knall's departure and attempt to take all the office's clients with them. Therefore, Stifel continued to make investments in the Indianapolis NW office based on its reasonable understanding that the business would continue.

58.     For example, on January 26, 2022, Stifel—signing as "STIFEL, NICOLAUS & COMPANY INCORPORATED, a Missouri corporation"—signed a ten-year lease to continue renting space at 600 E. 96th Street for the Indianapolis NW office.



59.     The lease committed Stifel to an expansion of the previous lease's square footage. The lease requires Stifel to pay rent for a period of 132 months for a minimum annual rent that would escalate to approximately $632,000 through 2033.

60.     The planned office move also caused Stifel to undertake significant, continuing efforts to build out the new space for the Indianapolis NW office. These efforts were coordinated and managed from St. Louis.

61.     Stifel paid contractors to design the new space, and purchased new technology, furniture, signage, and office decor. These efforts were not required as part of the January 2022 lease, and the costs were incurred on an ongoing basis through February 2023.

62.     Stifel spent significant funds between January 2022 and February 2023 building out the new space for the Indianapolis NW office, as well as making a long-term commitment to the office through executing the lease.

63.     Defendants, and Cohen, Pence, and Knall, knew that Stifel was making significant capital investments in the Indianapolis NW office through February 2023.

64.     In addition to Cohen, Pence, and Knall, the Indianapolis NW office had more than 30 other employees.

65.     Several of these employees accepted offers of employment with Stifel contingent on employment restrictions.

66.     Many of the Indianapolis NW office employees (including, at minimum, Arynn Deluca, Zachary Heeke, Ali Schmitt, Joshua Shneyderov, Peter Teneriello, Tom Morgan, and Andy LeBlanc) agreed that, during their employment and for a period of twelve months thereafter, they "will not, directly or indirectly, solicit any person who is or was an employee, independent contractor, consultant, or advisor of Stifel or its affiliates at any time during the twelve (12) months

preceding such termination of employment (an "Affected Person") to be employed by or provide services for another party in any capacity ("Alternative Employment"). Solicitation shall include your inducing, attempting to induce, or encouraging an Affected Person to take Alternative Employment…."

67.     These employees agreed that in the event of a breach of the provisions cited above, Stifel would be entitled to seek temporary, preliminary, and/or permanent injunctive relief in connection therewith, expressly acknowledged that the harm that might result to Stifel's business "would be irreparable," and agreed not to oppose the granting of any injunctive relief in connection therewith.

68.     LeBlanc, the office's Chief Operating Officer until his sudden departure on February 16, 2023, was also subject to terms prohibiting the solicitation of clients. He agreed that for a period of twelve months after his employment terminates with Stifel, he would not "directly or indirectly, solicit or encourage any client or customer of Stifel on the date of such termination of employment or at any time during the twelve (12) month period prior thereto, to cease doing business with Stifel or to do business, directly or indirectly, with you or any other individual or entity, unless the solicitation is for products or services that Stifel does not provide."

69.     LeBlanc signed the agreement containing the provisions quoted in Paragraphs 66-68 on March 8, 2021:

Accepted and Agreed on 3/8, 2021

R. Andrew LeBlanc

cc: Human Resources

70.     Approximately 24 of the Indianapolis NW office employees were registered with

13

FINRA in connection with their Stifel employment, including Cohen, Pence, and Knall.

71.     As such, these employees were required to abide by all FINRA rules and regulations.

72.     FINRA Rule 3270 provides that "No registered person may be an employee, independent contractor, sole proprietor, officer, director or partner of another person, or be compensated, or have the reasonable expectation of compensation, from any other person as a result of any business activity outside the scope of the relationship with his or her member firm, unless he or she has provided prior written notice to the member, in such form as specified by the member."

**D. Defendants Plot to Form Sapient Capital, LLC and Move All Indianapolis NW Office Employees and Clients to Sapient.**

73.     While still employed at Stifel, Cohen, Pence, and Knall (Managing Directors) and LeBlanc (COO) were also conspiring and taking steps to form a competitor entity, Sapient, to which they could take all the employees and clients from Stifel's Indianapolis NW office—all without Stifel's knowledge.

74.     Sapient is an independent advisor firm located at 310 E. 96th St. Suite 200, Indianapolis, Indiana. Its office is approximately 0.3 miles from the Stifel's Indianapolis NW office.

75.     Cohen, Pence, and Knall are the Managing Directors of Sapient.

76.     Upon information and belief, Cohen, Pence, and Knall served as the Managing Directors of Sapient while they were still employed by Stifel.

77.     Upon information and belief, Defendant Sapient Capital Founders, LLC owns Sapient.

78.     Cohen, Pence, and Knall are the managing members of Sapient Capital Founders,

LLC.

79.     Cohen owns at least 25% of Sapient Capital Founders, LLC.

80.     Pence owns at least 25% of Sapient Capital Founders, LLC.

81.     Knall owns at least 25% of Sapient Capital Founders, LLC.

82.     Knall, Cohen, and Pence, along with LeBlanc, began conspiring to leave the Indianapolis NW office, to solicit others to leave the office with them, and to form Sapient in the time leading up to October 27, 2022 (when Sapient was organized under Delaware law), while they were still Stifel employees. Defendants also acquired the "sapientcapital.com" domain name in advance of their departure, while its owners and managers were still employed at Stifel. Neither Sapient nor its owners informed Stifel of this activity.

83.     In 2022, Knall and Cohen, for the first time, requested access to internal Stifel information technology systems that would have allowed them to access Stifel client information without Stifel's knowledge or involvement. Stifel denied the request. On information and belief, this request demonstrates that the plot for Sapient to take Stifel's employees and clients began in 2022.

84.     On January 17, 2023, Sapient registered with state securities authorities in Florida and Indiana, without disclosure to Stifel.

85.     On February 6, 2023, Sapient obtained 120-Day approval from the SEC, again without disclosure to Stifel.

86.     On February 13, 2023, parts of the Sapient Capital website were launched and were available on the internet.

87.     On the evening of February 16, 2023, Sapient, through Cohen, Pence, and Knall, and with LeBlanc's assistance, extended employment offers to all the brokers at Stifel's

Indianapolis NW office for positions at Sapient.

88.     At this time, Cohen, Pence, Knall, and LeBlanc were still employees of Stifel.

89.     The next morning, at 10:32AM CST, Cohen, Pence, and Knall sent their resignation letters to a Stifel employee via email.

90.     Before Cohen, Pence, and Knall resigned and while they were still employees of Stifel, they directed Sapient to sign the Protocol for Broker Recruiting (the "Protocol").

91.     At 10:43AM CST—eleven minutes later—LeBlanc, still a Stifel employee subject to contract-based restrictions on his ability to solicit employees and clients, emailed Malcolm Frost, an employee at Stifel's other Indianapolis office, from his Stifel email address:

> **From:** LeBlanc, Andy (KCP Group) <leblanca@stifel.com>
> **Sent:** Friday, February 17, 2023 10:43 AM CST
> **To:** Frost, Malcolm (Indianapolis IN Keystone) <mfrost@stifel.com>
> **CC:** whiteygc@gmail.com <whiteygc@gmail.com>
> **Subject:** Resignations
> **Attachment(s):** "20230217112624948.pdf"
>
> Please find attached resignation for :
>
> Employees have left key fobs on desk
>
> Letters are on  your desk

A list of employees followed, and attached were resignation letters for LeBlanc and 26 other employees from the Indianapolis NW office. LeBlanc indicated that resignation letters from three other employees of the Indianapolis NW office would follow under separate cover.

92.     LeBlanc's efforts to cause at least 26 employees from the Indianapolis NW office to resign and join Defendants constituted a direct violation of the non-solicit provision in LeBlanc's employment agreement, in which he promised he would "not, directly or indirectly, solicit any person who is or was an employee, … or advisor of Stifel or its affiliates at any time

during the twelve (12) months preceding such termination of employment."

93.     Moreover, many of the resignation letters tendered by LeBlanc to Stifel explicitly stated that the individuals resigning to join Defendants took a list of Stifel's client accounts.

94.     When those individuals departed, they told Stifel that they intended to solicit those accounts, which included clients located in Missouri or invested in vehicles operated by Stifel in Missouri.

95.     LeBlanc thus directly or indirectly solicited Stifel's clients, constituting a direct violation of the non-complete provision in LeBlanc's employment agreement.

96.     After the resignation, upon information and belief, Respondents provided a thumb drive to Pershing, another financial institution, for approximately 7,500 client accounts, which is direct evidence of Respondents' premeditated and coordinated efforts in advance of their resignations from Stifel to raid Stifel's Indianapolis NW office.

97.     All of the departing individuals claimed that solicitation of such clients would be proper under the Protocol for Broker Recruiting.

98.     After receiving the email, Frost drove to the Indianapolis NW office and found the office empty.

99.     All but very few of the Indianapolis NW office employees agreed to join Sapient, leaving Stifel without the capabilities in that office to service its clients. (Stifel has since allocated other employees and hired a dedicated employee to minimize client disruptions.)

100.     On information and belief, prior to the termination of their employment on February 17, 2023, LeBlanc, Cohen, Pence, and Knall—acting for the benefit of Sapient and Sapient Capital Founders, LLC—advised other Stifel employees in the office regarding their scheme to move the entire Stifel business to Sapient, thus actively and directly competing with Stifel for employees,

rather than exert their best efforts on Stifel's behalf.

101.   This premeditation is reflected in the swift, seamless transition of employees to Sapient.

102.   On the very date of the mass resignation, February 17, 2023, Cohen and Pence registered with FINRA as persons associated with Sapient, along with multiple other former Stifel employees: Timothy Jansen, Karthik Raghupathy, Michael Hall, Patrick O'Marro, Connor Kucera, Jamie Rich, and Eduardo (Michael) Aguirre.

103.   On February 18, 2023, other parts of the Sapient Capital website began to be accessible to the public.

104.   On February 21, 2023, Knall also registered with FINRA as a person associated with Sapient.

105.   Additionally, Defendants intend to take, and upon information and belief, have solicited, all Stifel's clients serviced by the Indianapolis NW office's clients, including clients who are residents of Missouri or who hold accounts based in Missouri.

106.   Notwithstanding LeBlanc's agreement that for twelve months—i.e., until February 16, 2024—he would not "directly or indirectly, solicit or encourage any client or customer of Stifel on the date of such termination of employment or at any time during the twelve (12) month period prior thereto, to cease doing business with Stifel or to do business, directly or indirectly, with you or any other individual or entity," on February 21, 2023, counsel to Sapient—Corey Kupfer— emailed counsel to Stifel "to get back to me ASAP with the appropriate contact person at Stifel with whom my clients could coordinate to ensure clients are served."

107.   In complete disregard for LeBlanc's restrictive employment covenants, when counsel to Sapient identified the proposed Sapient contact for facilitating client departures from

18

Stifel, Sapient selected LeBlanc and told counsel to Stifel to have the "Stifel representative contact Andy ASAP" at his new sapientcapital.com email address:



> 1. The contact person on our side will be:
>
>    Andy LeBlanc
>
>    Email (Sapient): aleblanc@sapientcapital.com
>
>    Cell: 516-456-8755
>
>    Please have the Stifel representative contact Andy ASAP

108.    While still in Stifel's employ (and after having created Sapient but not having resigned from Stifel), Cohen, Pence, and Knall contacted Stifel clients (using Stifel's e-mail and technology) on behalf of Sapient to set up meetings the week after they intended to resign from Stifel. For example, on Tuesday, February 14, 2023, Cohen emailed Stifel clients regarding their 2022 year-end performance reports. In one such email, he stated: "I will call you within the next week to discuss."

109.    In fact, on Friday, February 17, 2023—the same day Cohen resigned from Stifel and just hours before he submitted his resignation—Cohen emailed at least one Stifel client a meeting invitation for a "Stifel Portfolio Review" scheduled for Thursday February 23, 2023.

110.    The same day, another Indianapolis NW office employee, Aguirre, emailed a Stifel client to set up a meeting on a Tuesday, February 21, 2023. He said, "I can come to your house since our offices are still under renovation."

111.    Since leaving Stifel, Defendants have engaged in a campaign designed to confuse and mislead Stifel clients into thinking they are or must become Defendants' clients, as if

transitioning client accounts is not the clients' decision.

112.    Defendants are (and have been) falsely advertising on Twitter, LinkedIn, and Facebook that "[t]he KCP Group is now Sapient Capital," and that their team will "continue working with our clients."

Twitter:



LinkedIn:



Facebook:



113.    To add to this confusion, at the same time and on the same platforms where Sapient is advertising that it "is" the KCP Group—or the Indianapolis NW office of Stifel—Knall

continued to represent that he worked for Stifel[1]:



114.     Defendants are (and have been) falsely advertising that they ***already*** serve Stifel's Indianapolis NW office clients, and/or that transfer of essentially all these clients to Sapient is in progress, when in fact, such transfers had (and have) not occurred. This false advertising was done to encourage clients to move their accounts to Sapient by falsely giving the appearance that clients had already transferred or had initiated transfers of billions of dollars in assets away from Stifel and to Sapient and that the entire Stifel office had made an orderly transition to Sapient, bringing all assets under management.

---

[1] https://www.linkedin.com/in/jamie-knall-3826742a (Feb. 24, 2023).

115.    When launched, the Sapient website, https://sapientcapital.com/about/about-sapient-capital/, described Sapient's "~$10 B Assets Under Management:"



116.    However, that disclosure carried, in small, light print, an asterisk; the $10,000,000,000 amount was an "[e]stimated value[]" because "Sapient Capital is a newly-formed registered investment advisor and is in process of transitioning clients":

* Estimated values. Sapient Capital is a newly-formed registered investment advisor and is in process of transitioning clients.

*Id.*

117.    Nowhere did Sapient disclose how it "estimated" this eleven-figure sum. In fact, as of February 20, 2023, such assets under management had not been transferred from Stifel to Sapient. Nor did Sapient disclose that the experience or assets described on the website refers to experience at the still-open Stifel office or assets still held at Stifel or that Stifel was still providing (and was committed to provide) service to those clients. Both the bold statement regarding that amount of assets or the unnoticeable footnote are inaccurate.

118.    A comparison between the Indianapolis NW office website describing the Stifel office and the Sapient website the weekend it was launched (as of February 20, 2023, 72 hours after the mass resignations), featured the following almost identical sets of information, confirming that Defendants were representing upon launch of their website that they ***already serve*** Stifel's

22

Indianapolis NW office clients:

| KCP Group Website When Employees Departed[2] | Sapient Website Upon Launch[3] |
|---|---|
| **40** Clients with $50 million+ in assets invested | 40 Clients with $50 Million+ in Assets Invested |
| **>35** Years investing for our longest-tenured client | 35+ Years Investing for Our Longest-Tenured Family |
| **3** Generations advised within many families | 3 Generations Advised within Many Families |

119.    Defendants have subsequently removed the information set forth in Paragraphs 115-116 and 118 from their website. However, the damage was done: During the key initial days after the raid, Sapient was making materially false representations about its operations and assets.

---

[2] https://thekcpgroup.com/tailored (Feb. 20, 2023).
[3] https://sapientcapital.com/about/about-sapient-capital/ (Feb. 20, 2023).

It has not removed its other social-media posts described herein.

120.    On February 22, 2023, Sapient published on its Twitter feed, as well as on LinkedIn, Instagram, and Facebook, that "Our team is honored and excited to ***continue working with our clients*** to help grow and safeguard their wealth" (emphasis added):



121.    Once again, these statements on Twitter, LinkedIn, Instagram, and Facebook are false and misleading because transfers of client accounts from the KCP Group to Sapient have not occurred to date.

122.    In fact, the day before, Sapient filed an amended ADV form (on February 21, 2023), which Cohen signed under penalty of perjury, representing that it still had ***no*** clients or regulatory assets under its management:



123.    Defendants' misleading or outright false statements about the scope and nature of Sapient's client base and assets under management were made in disregard of laws requiring financial advisers to make full and adequate disclosures to potential clients on such matters, such as Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.

124.    On information and belief, Cohen, Pence, Knall, and LeBlanc used Stifel's confidential information in furtherance of their plot to form a competitor entity and attempt to take all the Indianapolis NW office employees and clients with it.

125.    Cohen, Pence, Knall, and LeBlanc were in a unique position to utilize their experience and inside knowledge of sensitive Stifel information—which they gained in their positions as Managing Directors or COO at Stifel's Indianapolis NW office—for the benefit of Sapient.

126.    The purpose of the Protocol for Broker Recruiting is not to allow others to escape liability for their tortious conduct. The Protocol for Broker Recruiting, where applicable, "does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for 'raiding.'"

127.    The Protocol for Broker Recruiting, where applicable, provides that Stifel is "free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing [advisor] before he or she has left" Stifel.

128.    On information and belief, Sapient signed the Protocol minutes before Cohen, Pence, and Knall submitted their resignations. Therefore, Sapient was not even a member of the Protocol for Broker Recruiting when the tortious conduct occurred, including the pre-departure plans to raid the Indianapolis NW office.

129.    Knall, Cohen, Pence, and LeBlanc owed duties to Stifel at the time Sapient purported to accede to the Protocol for Broker Recruiting.

130.    Moreover, the Protocol for Broker Recruiting does not permit the tortious conduct alleged herein. It does not insulate Defendants (or any former Stifel employees) from claims arising from pre-resignation solicitation of Stifel's clients, pre-resignation solicitation of Stifel's

employees, tortious interference with contractual relationships, false advertising, or fraudulent misrepresentations. To the contrary, the Protocol for Broker Recruiting, where applicable, is designed only to ensure that an orderly handoff of a limited amount of client information (limited to name, address, phone number, e-mail address, and account title) may occur when an advisor switches between firms that have both acceded to the Protocol.

**E.  Stifel Expends Considerable Efforts to Support its Clients in the Wake of the Coup.**

131.    The abrupt departure of Cohen, Pence, Knall, LeBlanc and the other Indianapolis NW office employees, and their attempt to take the office's clients with them, is and has been extremely detrimental to Stifel and to its clients.

132.    Stifel has a financial interest in maintaining its Indianapolis NW office and client base and it has a critical interest in maintaining its hard-earned reputation for client service even under challenging circumstances.

133.    To the extent any clients do ultimately transfer to Sapient, it is important to Stifel and its business reputation that its clients are transitioned seamlessly, consistent with all relevant laws and regulations, and in a way that does not harm any clients.

134.    Defendants' efforts have disrupted Stifel's service of its clients.

135.    Stifel is also subject to laws and regulations that require it to maintain client confidentiality from non-employees and dictate the proper transition of its clients' financial accounts.

136.    Typically, and as Cohen and David Knall did when they came to Stifel from McDonald, a transition plan is negotiated to ensure a lawful and seamless transition.

137.    Although Defendants knew for many months that they would instigate mass transfers of Stifel's client accounts at one time, they did not notify Stifel of their pending departure.

138.    Instead, Stifel learned of Defendants' scheme the day the Indianapolis NW office employees resigned *en masse*, and no more than one day before Defendants began attempting to transition the office's clients to Sapient.

139.    Defendants' failure to provide any notice of their plans have harmed Stifel and its clients.

140.    Stifel has been forced to expend considerable efforts on these matters to support its clients in the aftermath of the sudden departure of the Indianapolis NW office's employees.

141.    Stifel is in the process of assembling appropriate teams to address the myriad of issues impacting its clients that have resulted from the *en masse* departure orchestrated by the Defendants.

142.    The Indianapolis NW office handled approximately 7,500 client accounts, which consist of both brokerage and advisory accounts. The transfer process will be lengthy and creates potential risks for Stifel's clients which require the dedication of significant resources by Stifel to mitigate those risks, particularly during the upcoming tax reporting period.

143.    For example, the client accounts involve several thousand brokerage accounts, but Stifel is not aware of a broker-dealer affiliated with Sapient to which such accounts can be transferred.

144.    Additionally, client accounts hold private funds of which Stifel is the general partner of the managing member, and those fund documents must be analyzed to determine next steps, now without any employees from the Indianapolis NW office to assist.

145.    At least one Stifel client has already expressed concerns that requested transactions were not completed. The Stifel client reached out to Michael Aguirre, former employee of the Indianapolis NW office, who represented to the client that "no one" was managing the client's

accounts. Stifel immediately took action to address the situation, but that client experience harmed Stifel and is an example of other disruptions faced by clients.

**F. Stifel Protects Its Confidential Information.**

146.    Stifel maintains the confidentiality of its protected information.

147.    Stifel has multiple employment policies in place that its employees must abide by and acknowledge on an annual basis that recognize and reinforce Stifel's rights in its confidential and proprietary property.

148.    Such policies include a Confidential and Proprietary Information Policy that limits an associate's use of confidential information "both during employment or after an Associate leaves the firm."

149.    Specifically, it provides:

> **"Confidentiality and Proprietary Information**
> Information concerning clients, Associates, operations, activities, and business affairs of the Firm is private and it is the obligation of every Associate to keep this information in strict confidence. Information considered confidential must not be disclosed to external parties or to Associates (except as necessary in the course of the Associate's job). If there is any question of whether particular information is considered confidential, Associates must check with their manager prior to disclosing the information. It is expected that confidential and proprietary information will not be disclosed at any time, both during employment or after an Associate leaves the Firm."

150.    Stifel's handbook also contains a strictly enforced policy limiting possession of a company's property:

> **"Company Property**
> Any information created or used for business purposes during employment is Stifel's property. Therefore, information an Associate wishes to take with him or her, either electronically or in hard copy format, must be authorized for release by the Legal Department. Associates must obtain express consent for each and every item they wish to copy or remove.
>
> Upon termination of employment with Stifel for any reason, Associates will

surrender and return to Stifel, through management, the originals and all copies of all records, books, client lists, notes, computer discs and records, correspondence, memoranda, and documents of any nature which are in the Associate's possession and/or control.

Associates are required to return all keys, supplies, building entry security cards, company credit cards, computers, computer files, laptops, cell phones/smart phones, electronic storage devices, and anything else constituting property of Stifel. In the event that an Associate fails to return certain property, Stifel reserves the right to take appropriate action. If Firm property is not returned in a timely manner, Stifel reserves the right to charge the departing Associate a fee equivalent to the replacement value of the item in question, in compliance with local, state, and federal law."

151.     Finally, the Handbook provides:

**"Statement of Confidentiality**

When an Associate exits the Firm, ***any and all*** proprietary or non-public information regarding Stifel, including but not limited to its clients and prospective clients, must remain confidential and not be used or disclosed to any third party unless otherwise authorized by Stifel in writing."

152.     Cohen, Pence, Knall, and LeBlanc, like the other Indianapolis NW office employees, signed annual acknowledgments of Stifel's policies and procedures, including those regarding the handling of firm information.

153.     Those acknowledgements stated that they had read, understood, and agreed to be bound by the policies contained in the Handbook. These annual agreements also stated that Cohen, Pence, Knall, and LeBlanc understood:

a)     The Firm is the owner or custodian of all information I handle for or on behalf of the Firm, whether it is stored on paper or electronically. This includes both (i) personal information related to clients, associates, and other individuals, and (ii) non-personal information related to Stifel's business affairs. I must treat this based on the Firm's classification of information as highly confidential, confidential, general, and public.

b)     I may not disclose any Firm information to non-affiliates or even other associates except as necessary to carry out my duties as an associate of the Firm. I must follow Firm policies and procedures on safeguarding information from unauthorized access, use, copying, sharing, storage, disposal, and other actions.

c)     If working from a non-Stifel location I must use secure network connections when accessing the Firm's work environments including, but not limited to, Stifel's network or 3rd party applications hosting Stifel data.

d)     In the event I'm no longer an associate of the Firm, I must promptly return all aforementioned information to the Firm and purge any Firm information that is on my personal devices.

154.    Despite these policies and acknowledgements, Cohen, Pence, Knall, and LeBlanc disregarded these obligations for the benefit of Defendants when they orchestrated and executed the departure of the Indianapolis NW office from Stifel.

## COUNT ONE

### False Advertising Under the Lanham Act, 15 U.S.C. § 1125(a)

155.    Stifel incorporates paragraphs 1-154 as if fully restated herein.

156.    Defendants, in connection with goods used in interstate commerce, have made and continue to make false statements of fact and false representations of fact as to the nature, characteristics and/or qualities of their client portfolio, including false representations that Stifel's clients are now Defendants' clients. For example, Defendants claimed to manage an estimated $10 billion in assets because "Sapient Capital is a newly-formed registered investment advisor and is in the process of transitioning clients"—Stifel's clients. Defendants also have posted across multiple social media channels—including Twitter, Instagram, LinkedIn, and Facebook—that "The KCP Group is now Sapient Capital! Our team is honored and excited to continue working ***with our clients*** to help grow and safeguard their wealth." (Emphasis added). But in reality, those clients have not transitioned from Stifel, and on information and belief, Sapient had zero assets under its control at the time of the website's launch.

157.    Defendants' false statements of fact and false representations of fact were made and continue to be made in commercial advertising that is material to the public's decision to

utilize Defendants' services and, in particular, to entice Stifel's clients to transfer their business to Defendants.

158.    Such acts by Defendants constitute false statements, descriptions, and representations of fact in commercial advertising and are a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

159.    As a proximate result of Defendants' willful conduct, Stifel has suffered irreparable harm, including irreparable harm to its reputation and goodwill and the reputation of its services, for which it has no adequate remedy at law, and Stifel will continue to suffer irreparable injury unless and until Defendants cease making false statements in connection with and to promote its services.

160.    Unless Defendants' activities cease, Defendants will unjustly profit from the clients they entice based on consumer reliance on the false statements that they have made and are making about their business. Stifel has suffered and will continue to suffer economic harms, including the loss of clients and commissions as proximately caused by Defendants' activities.

161.    Pursuant to 15 U.S.C. § 1117, Stifel is entitled to actual damages to be determined at trial, to have such damages trebled, to disgorgement of Defendants' profits, and to be reimbursed for the costs of this action and its related attorneys' fees.

## COUNT TWO

### Common Law Injurious Falsehood

162.    Stifel incorporates paragraphs 1-161 as if fully restated herein.

163.    Defendants have published false statements that are harmful to Stifel's commercial and reputational interests, including their claim that they are transitioning $10 billion in assets (from Stifel) to Sapient.

164.    Defendants intended for the publication of these false statements to result in pecuniary harm to Stifel. Alternatively, Defendants recognized or should have recognized that publication of these false statements was likely to result in pecuniary harm Stifel.

165.    Defendants knew that their published statements were false or acted in reckless disregard of the truth or falsity of the statements.

166.    Stifel is likely to suffer, has suffered, and will continue to suffer damages and irreparable injuries as a result of Defendants' wrongful acts, and Defendants are liable for damages to Stifel in amounts to be determined which exceed $75,000.

### COUNT THREE

**Tortious Interference with the LeBlanc Employment Contract**

167.    Stifel incorporates paragraphs 1-166 as if fully restated herein.

168.    Prior to February 17, 2023, Stifel employed the Chief Operating Officer of the Indianapolis NW office, Andrew LeBlanc subject to a written employment contract. The employment contract between Stifel and LeBlanc was a valid and enforceable contract.

169.    Stifel enjoyed substantial benefit from its employment contract with LeBlanc, which Stifel reasonably expected would continue to inure to its benefit.

170.    Stifel invested significant amounts of money and time in developing and maintaining its employment relationship with LeBlanc.

171.    In light of the work LeBlanc engaged in at Stifel, including the vast scope of LeBlanc's role, responsibilities, and access to information, his knowledge of Stifel's confidential, sensitive, and proprietary information is extensive.

172.    LeBlanc's employment with Stifel was contingent on certain agreed terms of employment, including the non-solicitation and non-compete provisions described in paragraphs

66-69.

173.    LeBlanc violated the non-solicitation provision of his employment contract with Stifel when he coordinated the departure of over 20 employees of the Indianapolis NW office for Sapient while he was still a Stifel employee, including by personally collecting their resignation letters and emailing them to Stifel.

174.    LeBlanc has violated and continues to violate the non-compete clause of his employment contract with Stifel by directly and indirectly soliciting Stifel clients for Sapient's benefit, including serving as the proposed contact for facilitating client departures from Stifel to Sapient.

175.    Defendants, through Cohen, Pence, and Knall, the Managing Directors of Stifel's Indianapolis NW office to whom LeBlanc reported, were aware of the existence of LeBlanc's employment agreement with Stifel.

176.    Defendants, along with Cohen, Pence, and Knall, intentionally interfered with Stifel's contractual relationship with LeBlanc by inducing LeBlanc to coordinate the resignation of the other Indianapolis NW office employees.

177.    Defendants, along with Cohen, Pence, and Knall, intentionally interfered with Stifel's contractual relationship with LeBlanc by inducing LeBlanc to facilitate client departures from Stifel to Sapient.

178.    Defendants, along with Cohen, Pence, and Knall, substantially and materially impaired the execution of Stifel's employment contract with LeBlanc, frustrating Stifel's expectations under the contract.

179.    Such interference with Stifel's employment contract with LeBlanc was accomplished by wrongful means and without justification as part of a scheme to unlawfully

solicit the Indianapolis NW office's employees and clients for Defendants' own personal benefit.

180.    These wrongful means include knowingly inducing LeBlanc to violate the terms of his employment agreement, including the non-compete and non-solicitation provisions and the breaches of fiduciary duty and false advertising described above, including Defendants' misrepresentations that Stifel's assets belong to Sapient and/or that the Indianapolis NW office "is now" Sapient.

181.    Additionally, on information and belief, Defendants, through Cohen, Pence, and Knall, utilized confidential information Cohen Pence and Knall obtained in their roles as Managing Directors of Stifel in order to coerce Stifel's Indianapolis NW office employees and clients to abandon Stifel and move to Sapient, and such efforts continue to date.

182.    On information and belief, LeBlanc was essential to the other employee's decisions to leave Stifel's Indianapolis NW office. LeBlanc's knowledge and experience gained from Stifel allow Sapient to more successfully poach Stifel's clients. Accordingly, through Defendants' interference with Stifel's employment contract with LeBlanc, Defendants have caused, are causing, and/or will cause in the future, substantial and irreparable damage to Stifel and its business operations to the extent Stifel's former employees moved to Sapient in whole or in part due to LeBlanc's solicitation, or Stifel's clients have or will move to Sapient in whole or in part due to LeBlanc's solicitation.

183.    Defendants' conduct thus constitutes tortious interference with Stifel's business relationships and they are liable for damages to Stifel in amounts to be determined which exceed $75,000.

## COUNT FOUR

### Tortious Interference with Business Relationships

184.    Stifel incorporates paragraphs 1-183 as if fully restated herein.

185.    Prior to February 17, 2023, Stifel maintained valid and advantageous business relationships with the clients served by its Indianapolis NW office, which Stifel reasonably expected would continue to inure to its economic benefit.

186.    Stifel enjoyed substantial profit from these business relationships.

187.    Stifel invested many years and significant amounts of money in soliciting, developing, and maintaining such relationships and growing the business.

188.    Stifel's relationships generated goodwill among these customers and created a reasonable expectation of future business. The knowledge Stifel has gained about these customers and the business terms of these relationships are confidential and proprietary business information.

189.    As Managing Directors of Stifel's Indianapolis NW office to whom the other office employees reported, Cohen, Pence, and Knall were aware of the existence of the business relationships. In fact, Cohen, Pence, and Knall fostered those relationships on Stifel's behalf for many years prior to their departure.

190.    Defendants, along with Cohen, Pence, Knall, and LeBlanc, intentionally interfered with Stifel's business relationships with its clients served by the Indianapolis NW office by soliciting them to leave Stifel and transition their assets to Sapient.

191.    Defendants worked with, conspired, and/or acted in concert with Cohen, Pence, Knall, and LeBlanc to raid Stifel clients for Defendants' own benefit.

192.    Such interference with Stifel's business relationships was accomplished by wrongful means and without justification as part of a scheme to misuse confidential information and unlawfully solicit the Indianapolis NW office's employees, for Defendants' own personal benefit. These wrongful means include the breaches of fiduciary duty, false advertising, and

35

fraudulent non-disclosure described above.

193.    On information and belief, Cohen, Pence, and Knall utilized confidential information they obtained in their roles as Managing Directors of Stifel in order to coerce Stifel's Indianapolis NW office clients to abandon Stifel and move their assets to Sapient, and such efforts continue to date.

194.    Defendants have employed additional wrongful means to interfere with Stifel's business relationships by inducing LeBlanc, recently departed Stifel employee, to facilitate Stifel clients' departure to Sapient in breach of the non-compete clause of LeBlanc's employment agreement, of which Defendants were aware.

195.    Defendants' conduct is not permitted by the Protocol for Broker Recruiting.

196.    Through Defendants' interference with Stifel's business relationships, Defendants have caused, are causing, and/or will cause in the future, substantial and irreparable damage to Stifel and its business operations.

197.    Defendants' conduct thus constitutes tortious interference with Stifel's business relationships and they are liable for damages to Stifel in amounts to be determined which exceed $75,000.

**COUNT FIVE**

**Common Law Unjust Enrichment**

198.    Stifel incorporates paragraphs 1-197 as if fully restated herein.

199.    Defendants have transitioned, or will transition, some Stifel clients based on Defendants' false representations about its services and client base.

200.    Defendants have enjoyed, or will enjoy, substantial profits from the transition of Stifel's clients to Sapient, based on false statements made by Defendants. These false statements

made by Defendants include their claim that they are transitioning $10 billion in assets (from Stifel) to Sapient.

201.     Defendants' gain of Stifel's clients comes at Stifel's expense.

202.     Defendants' conduct is not permitted by the Protocol for Broker Recruiting.

203.     Defendants have been unjustly enriched as a result of their false statements and misleading advertising practices, and under principals of equity should not be permitted to retain these unjustly acquired gains. Defendants are liable for damages to Stifel in amounts to be determined which exceed $75,000.

## COUNT SIX

### Breach of Fiduciary Duty, including Aiding and Abetting and Conspiracy

204.     Stifel incorporates paragraphs 1-203 as if fully restated herein.

205.     As officers and employees of Stifel, Cohen, Pence, Knall, and LeBlanc owed fiduciary duties to Stifel, including the duty of loyalty.

206.     For many months before their sudden departure, Cohen, Pence, Knall, and LeBlanc planned to leave their employment with Stifel, take the Indianapolis NW office employees and clients with them, and go into competition with Stifel as a competitor. Thereafter, their actions were on behalf of Sapient and intended to harm Stifel.

207.     While still employed at Stifel, Cohen, Pence, Knall, and LeBlanc actively and directly competed with Stifel by convincing other Indianapolis NW office employees to terminate their employment with Stifel on the appointed day.

208.     While still employed at Stifel, Cohen, Pence, Knall, and LeBlanc actively and directly competed with Stifel by taking material steps to encourage Stifel's Indianapolis NW office clients to agree to transfer their accounts to Sapient.

209.    By focusing on their efforts to form a competitor entity—to Stifel's clear detriment—during their employment with Stifel, Cohen, Pence, Knall, and LeBlanc were distracted from the performance of their official duties and did not deal fairly, honestly, and openly with Stifel.

210.    Moreover, to achieve these ends, Cohen, Pence, Knall, and LeBlanc used Stifel's confidential information (including the client account information sent just before departure to clients to set up meetings on behalf of Sapient) while still employed by Stifel, including non-public information about Stifel's clients, employees, operations, activities, and business affairs.

211.    Cohen, Pence, Knall, and LeBlanc willfully acted against the best interests of Stifel while they were employed by Stifel.

212.    Stifel was harmed by Cohen's, Pence's, Knall's, and LeBlanc's breach of their fiduciary duties in that Stifel has lost clients, goodwill, and commissions because Defendants acted against the best interests of Stifel by conspiring to leave Stifel *en masse* and soliciting employees and clients away from Stifel.

213.    Cohen's, Pence's, Knall's, and LeBlanc's conduct thus constitutes a breach of the fiduciary duty of loyalty they owed Stifel.

214.    Defendants aided and abetted this breach of fiduciary duty. Defendants, through its owners and managing employees, were aware of the existence of the duties and actively encouraged the breach of duty for Defendants' benefit, and aided and abetted these breaches by establishing the vehicle that would allow the breach to occur.

215.    Defendants knowingly and substantially assisted the breach of fiduciary duty, including because they worked with, conspired, and/or acted in concert with Cohen, Pence, Knall, and LeBlanc to raid Stifel employees and clients for Defendants' own benefit and, upon

information and belief, Stifel employees were asked to sign new employment contracts with Sapient with Cohen, Pence Knall, and LeBlanc acting on behalf of Defendants.

216.    Defendants were aware of their role when providing the assistance to Cohen, Pence, Knall, and LeBlanc as those individuals breached their fiduciary duties.

217.    Accordingly, Defendants aided and abetted Cohen, Pence, Knall, and LeBlanc in their breach of their fiduciary duties.

218.    Defendants' conduct is not permitted by the Protocol for Broker Recruiting.

219.    Additionally, Defendants conspired or acted in concert with one another and with Cohen, Pence, Knall, and LeBlanc in their breach of their fiduciary duties. Defendants and the individuals agreed to and committed overt acts in furtherance of the breach of duties described above. Stifel was harmed as a proximate result of Defendants' and the individuals' actions taken pursuant to their conspiracy in that Stifel, as stated above, has lost clients, goodwill, and commissions.

220.    Thus, Defendants are liable for damages to Stifel in amounts to be determined which exceeds $75,000.

## COUNT SEVEN

### Fraudulent Misrepresentation/Concealment, including Conspiracy and Aiding and Abetting

221.    Stifel incorporates paragraphs 1-220 as if fully restated herein.

222.    Defendants began orchestrating their scheme many months ago—since at least October 2022, when they formed Sapient under Delaware law.

223.    By virtue of their fiduciary relationship as employees and officers of Stifel, Cohen, Pence, Knall, and LeBlanc had a duty to disclose their plans regarding the Indianapolis NW office and the fact that they and Defendants intended to compete directly with Stifel for

business and employees that they were responsible for managing while employed by Stifel.

224.    Defendants, and Cohen, Pence, Knall, and LeBlanc, knowingly failed to disclose to Stifel and, by their silence, misrepresented their intentions regarding the future of the Indianapolis NW office.

225.    Defendants, and Cohen, Pence, Knall, and LeBlanc knew or should have known that, unless told otherwise, Stifel believed these individuals would continue to work at Stifel's Indianapolis NW office, as some had for nearly twenty years.

226.    Defendants, and Cohen, Pence, Knall, and LeBlanc, knew or should have known that Stifel acted in reliance on its understanding that they had no plans to terminate their employment, taking the Indianapolis NW office employees and clients with them. For example, they were aware that Stifel recently negotiated a new ten-year lease for the Indianapolis NW, which committed Stifel to pay millions of dollars for the group's office space.

227.    Particularly considering the parties' history, Stifel acted in reliance on this silence and lack of notice when it continued to invest in the Indianapolis NW office. Specifically, Stifel entered into a ten-year lease and, over the last year, built out a new office space for the Indianapolis NW office at significant expense. Stifel would not have made these investments had it known of the plans for Sapient.

228.    Stifel was damaged in reliance on the representations (or silence) of Cohen, Pence, Knall, and LeBlanc, including at minimum the amount it is now obligated to pay in connection with the lease it no longer has any need for.

229.    Defendants aided and abetted this fraudulent concealment.

230.    Defendants knowingly and substantially assisted the breach of fiduciary duty and non-disclosure, including because they worked with, conspired, and/or acted in concert with

Cohen, Pence, Knall, and LeBlanc to raid Stifel employees and clients for Defendants' own benefit and, upon information and belief, Stifel employees were asked to sign new employment contracts with Sapient.

231.    Defendants were aware of their role when providing the assistance to Cohen, Pence, Knall, and LeBlanc as those individuals fraudulently concealed their plans.

232.    Defendants' conduct is not permitted by the Protocol for Broker Recruiting.

233.    Accordingly, Defendants aided and abetted Cohen, Pence, Knall, and LeBlanc in their fraudulent concealment.

234.    Additionally, Defendants conspired or acted in concert with Cohen, Pence, Knall, and LeBlanc in their fraudulent concealment.

235.    Additionally, Defendants conspired or acted in concert with one another and with Cohen, Pence, Knall, and LeBlanc in their fraudulent concealment. Defendants and the individuals agreed to and committed overt acts in furtherance of the fraudulent concealment described above. Stifel was harmed as a proximate result of Defendants' and the individuals' actions taken pursuant to their conspiracy in that, as stated above, Stifel expended significant resources to build out an office space for the Indianapolis NW office and entered into a ten-year lease for the group, which it no longer needs.

236.    Thus, Defendants are liable for damages to Stifel in amounts to be determined which exceed $75,000.

### COUNT EIGHT

**Common Law Unfair Competition**

237.    Stifel incorporates paragraphs 1-236 as if fully restated herein.

238.    Defendants, along with Cohen, Pence, Knall, and LeBlanc undertook the foregoing acts of false advertising, breach of fiduciary duty, fraudulent non-disclosure, tortious interference with Stifel's business relationships and employees, raiding of Stifel's employees and clients, and harm to Stifel's goodwill and reputation to gain an unfair competitive advantage over Stifel.

239.    Additionally, on information and belief, Defendants, and Cohen, Pence, Knall, and LeBlanc, used Stifel's confidential information—including non-public information about Stifel's clients, employees, operations, activities, and business affairs—in furtherance of their plan to leave their employment with Stifel, take the Indianapolis NW office's employees and clients with them, and go into competition with Stifel as a competitor. As stated, Stifel generally does not disclose its confidential information. Rather, Cohen, Pence, Knall, LeBlanc, and other employees at the Indianapolis NW office had access to Stifel's confidential information by virtue of their positions as trusted Stifel employees.

240.    Cohen, Pence, Knall, and LeBlanc agreed, among other things, to treat as confidential 1) personal information related to clients, associates, other individuals, and 2) non-personal information related to Stifel's business affairs, and to treat such information based on Stifel's classification of information as highly confidential, confidential, general, and public. They also agreed that, upon the termination of their employment, they would promptly return all confidential information to Stifel and purge any such information on any personal devices.

241.    Defendants were aware that the information obtained by Cohen, Pence, Knall, and LeBlanc was Stifel's confidential information.

242.     Defendants, and Cohen, Pence, Knall, and LeBlanc willfully undertook the foregoing acts with knowledge of and disregard for Stifel's rights, and with the intention of causing harm to Stifel and benefitting themselves.

243.     Defendants' conduct is not permitted by the Protocol for Broker Recruiting.

244.     As a result of Defendants' actions, Defendants are unfairly competing in the marketplace for investment advisory services.

245.     As a result of Defendants' unfair competition, Stifel has been injured and faces irreparable injury. Stifel is threatened with losing customers, employees, its competitive advantage, and goodwill.

246.     Accordingly, Defendants' conduct constitutes unfair competition, and they are liable for damages to Stifel in amounts to be determined which exceed $75,000.

## PRAYER FOR RELIEF

WHEREFORE, Stifel prays that the Court enter a judgment against Defendants and requests that:

A.     Judgment be entered in Stifel's favor on each Claim in the Complaint;

B.     An order directing Defendants to correct the false and misleading claims made by Defendants in their advertising;

C.     An award of damages attributable to Defendants' violations of law as detailed above and a constructive trust or other appropriate equitable relief on the profits earned by Defendants;

D.     A declaration that this is an "exceptional case" due to the willful nature of Defendants' false advertising, and awarding enhanced damages and attorneys' fees to Stifel

pursuant to 15 U.S.C. § 1117, and punitive damages and attorneys' fees to the full extent allowable under state statutory and common law;

E.      Awarding prejudgment and post-judgment interest on any monetary award in this action;

F.      Award of the costs and disbursements of this action; and

G.      Such other and further relief as the Court may deem just and proper.

Dated: February 28, 2023                    Respectfully submitted,

**DOWD BENNETT LLP**

By:   ___/s/ James F. Bennett_____
        James F. Bennett MO #46826
        Philip A. Cantwell MO #65505
        Arin H. Smith MO #72636
        7676 Forsyth Blvd., Suite 1900
        St. Louis, Missouri 63105
        (314) 889-7300 (telephone)
        (314) 863-2111 (facsimile)
        jbennett@dowdbennett.com
        pcantwell@dowdbennett.com
        asmith@dowdbennett.com